UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DYNAMIC RANDOM ACCESS MEMORY (DRAM) DIRECT PURCHASER LITIGATION | Case No. 4:18-cv-03805-JSW-KAW<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 62, 70 |

Plaintiffs John Treanor and onShore Networks of Illinois, L.L.C. (together, "Plaintiffs"), who are direct purchasers of DRAM between June 1, 2016 and February 2018 ("Class Period"), bring this antitrust action against defendants Micron Technology, Inc.; Micron Semiconductor Products, Inc.; Crucial Technology, Inc. (together, "Micron"); Samsung Electronics Co., Ltd.; Samsung Semiconductor, Inc. (together, "Samsung"); SK Hynix, Inc.; and SK Hynix America, Inc. (together, "Hynix") (collectively, "Defendants"). Plaintiffs allege that Defendants conspired to restrict output of DRAM products in violation of section 1of the Sherman Act during the Class Period. The allegations are based on the same conduct as in the related case, *In re Dynamic Random Access (DRAM) Indirect Purchaser Litigation*, Case No. 4:18-cv-02518-JSW (filed on Apr. 27, 2018) (hereinafter, "Indirect Purchaser Litigation").

Now before the Court is Defendants' motion to dismiss Plaintiffs' Consolidated Complaint. (Dkt. No. 56 ("Complaint").) The Court has already dismissed virtually identical allegations in the Direct Purchaser Litigation, without leave to amend. *See* Case No. 4:18-cv-2518, Dkt. No. 119 (entered Nov. 24, 2020) ("MTD Order"). Because Plaintiff's additional allegations do not change the analysis, the Court GRANTS Defendants' motion.

1

# BACKGROUND

The factual allegations of this putative class action are virtually identical to those in the Indirect Purchaser Litigation. As explained for that case: "In 2016, the three major DRAM producers switched from ruinous competition to shared monopoly power by keeping supply growth slightly below demand growth. The change began with Samsung, the market leader, who twice cut supply growth in 2015 and 2016. The first supply cut failed to garner followers, but the second supply cut was followed by Hynix and Micron the next quarter. During this time, Defendants made public observations about reduced supply in the industry and its effect on higher profits, and indicated, in response to analyst questions, that they do not intend to expand supply. The industry trend began when the market became more concentrated and ended when Samsung entered into an agreement with Chinese antitrust regulators that, through unspecified terms, resulted in decreased prices." (MTD Order at 17:13-22.)

As in that case, Plaintiffs allege that Defendants initiated and maintained the conspiracy through public communications; that the DRAM market is highly concentrated; that Defendants had "opportunities to collude" through trade associations and executive hires; and that Defendants have a "history of collusive activity." (Complaint §§ VII.B, VII.L, VII.I, VII.K, VII.E, VII.J.) However, Plaintiffs also include allegations regarding "economic evidence" of price volatility and profit margins that was not included in the Indirect Purchaser Litigation complaint. (*Id*. § VII.L.) Otherwise, the allegations are a subset of those dismissed in the Indirect Purchaser Litigation. (*See generally* MTD Order.)

The Court shall address additional facts as necessary in this Order.

# ANALYSIS

**A.    Legal Standard**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations." 15 U.S.C. § 1. The key to pleading a section 1 violation lies in allegations of an agreement, as opposed to independent decision making. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007). Otherwise, allegations that are merely consistent with a conspiracy, but equally

2

consistent with independent conduct, cannot state a claim under section 1. *See id.* at 557; *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).

To plead an agreement, a plaintiff may rely on "parallel conduct" —i.e., that defendants undertook some action simultaneously—together with "plus factors" that are "consistent with explicitly coordinated action" but "inconsistent with unilateral conduct." *In re Musical Instr. & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). The plus factors are meant to suggest "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependent unaided by an advance understanding among parties." *Twombly*, 550 U.S. at 556 n.4.

### B.  Plaintiffs Fail to Plead an Agreement.

As explained in the Indirect Purchaser Litigation, which relies on the same allegations, Plaintiffs have adequately alleged parallel conduct, namely, that Defendants all restricted output around the same time. Although Defendants challenge Plaintiffs' claim on the grounds that the complaint lacks allegations of parallel conduct *before* the Class Period, and that some Defendants increased supply during that time, neither of those arguments defeats Plaintiffs' claims. The crux of Plaintiff's allegations is that Defendants kept supply growth slightly below demand growth, which remains parallel regardless of pre-Class conduct or variations in specific increases and decreases of supply. (*See* Complaint ¶¶ 82, 119-20.)

As to plus factors, Plaintiffs rely on allegations of (1) economic evidence, including reduced price volatility, (2) actions against self-interest, (3) communications encouraging supply fixing, (4) previous convictions for price fixing, (5) current investigations into Defendants' conduct, (6) structure of the industry, (7) opportunities to conspire, and (8) purported "direct" evidence of conspiracy. Of these, the allegations related to the second through eighth factors were addressed in the Indirect Purchaser Litigation orders. (*See* MTD Order at 10-18; *cf.* Indirect Purchaser Litigation, Case No. 4:18-cv-2518-JSW, Dkt. No. 98 (entered Sept. 3, 2019).) The Court incorporates the same analysis here to find that those factors are not "inconsistent with unilateral conduct" and therefore not sufficient to allege a conspiracy. The remaining plus factor and holistic analysis are addressed below.

### 1. Plaintiff's Economic Evidence

Plaintiffs rely on economic evidence that purports to show a conspiracy, including reduced price variation, large increases in profit margins, and large profit margins compared to similar markets. On balance, Plaintiffs fail to sufficiently allege these plus factors.

Beginning with reduced price variation, Plaintiffs have not shown that the price variation actually decreased during the Class Period. Figure 1 of the complaint shows that price changes were tightly coupled beginning in 2014—the time period when the indirect purchasers alleged the market became significantly more concentrated—and Plaintiffs have not alleged that the price variation in 2016-2018 was greater than the price variation in 2014-2016. (*See* Complaint ¶ 286 & Fig. 1; *see also* MTD Order at 15:15-18.) Moreover, Plaintiffs have not shown that reductions in price variation are indicative of a supply-related conspiracy—their economic literature does not appear to address the scenario.



**Figure 1: DRAM Prices**
Quarterly DRAM Price Changes by Manufacturer (Dollars/GB)
Source: Company Results; DRAMeXchange; Wells Fargo Securities LLC.

With respect to the profit margins, Plaintiffs' chart shows that Defendants experienced high margins of 30-50% in 2014 that declined precipitously during the "ruinous competition" period of 2015. (Complaint ¶ 189 & Fig. 2.) The margins then began rising again *before* the Class Period for Micron and Hynix and at the beginning of the Class Period for Samsung. (*Id.*)

4

Although the margins reached new heights of 50-70% in 2017, they continued to climb to even higher levels after the Class Period. (*Id.*) These allegations thus suggest that high profit margins were not only not unusual but also not caused by a conspiracy.[1]



Finally, with respect to profit margins at comparable industries, Plaintiffs fail to allege that the other markets are comparable. In particular, Plaintiffs focus on the products sold (CPUs, memory chips, etc.) without alleging any facts about the market structure, such as the number of suppliers, which would be necessary to distinguish the possibility of conscious parallelism. (*See id.* ¶¶ 191-97.) Moreover, even if those markets were comparable, Plaintiffs' allegations do not support their claim. Figure 3 shows that Defendants had similar margin differences of 10-30% compared to NAND profit margins in 2015 as they did in 2017. (*Id.* ¶ 193 & Fig. 3.) It also shows that NAND profit margins increased to unprecedented levels in 2018, just as they did for DRAM (albeit by a lesser amount), which suggests that the increased margins were driven by independent factors in both markets. (*See id.*)

---

[1] Indeed, Figure 2 suggests that the low profit margins prior to the Class Period were themselves unusual for the market.



As to Intel's profit margins, Plaintiffs are comparing apples and oranges by contrasting Defendants' DRAM products against *all* semiconductor products made by Intel. (*Id.* ¶ 195 & Fig. 4.) The variation in the two does not appear to be comparable because Intel's margins are shown to be "bumpy," with short-term increases that last a few quarters, while Defendants' margins are relatively "smooth," with long-term trends that continue for a year or more. (*See id.* at Fig.4.)



1   For these reasons, Plaintiffs' plus factors based on economic evidence are not sufficient to
2   draw a reasonable inference of conspiracy.

### 2. Holistic Analysis

Because the remaining plus factors are identical to those dismissed in the Indirect Purchaser Litigation, the Court notes that Plaintiffs' Complaint is stronger only because it alleges *less* than the complaint in the Indirect Purchaser Litigation. In particular, Plaintiffs do not allege that Samsung had unilaterally attempted to cut supply before the alleged conspiracy period—which completely undermines the notion that such cuts were too perilous to undertake absent a conspiracy—and do not allege that the market became oligopolistic only in the last few years—which provides a plausible alternative explanation for the changed behavior. (*See* MTD Order at 15:9-24 & n.10.) Nevertheless, even in the absence of these fatal allegations, Plaintiffs still have not alleged a plausible conspiracy against the background of interdependent conduct.

At bottom, Plaintiffs' allegations show only that Defendants had motive and opportunity to collude, not that they actually reached any agreement. To allege this critical point, Plaintiffs rely on "public statements" that amount to little more than observations of competitors behavior, which are to be expected in a market where any company's profits hinges on the others' behavior. It is not clear whether Plaintiffs expected Defendants to avoid analyst questions on this point or to pretend that they were not tracking competitors' behavior, despite its importance to their business. Regardless, the Court reaches the same conclusion as it did in the Indirect Purchaser Litigation—the harms alleged by Plaintiffs are those stemming from oligopoly, not a conspiracy.

Accordingly, the Court DISMISSES Plaintiffs' Complaint.

## C. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss. Because Plaintiffs have not previously amended their complaint, and may conceivably allege something new, leave to amend is GRANTED. Plaintiffs may file an amended complaint within twenty one days.

**IT IS SO ORDERED.**

Dated: December 21, 2020

_____
JEFFREY S. WHITE
United States District Judge